1

2

3

4

5

6

7

8

9                    UNITED STATES DISTRICT COURT

10                   EASTERN DISTRICT OF CALIFORNIA

11
                          ----oo0oo----
12

13
GARY ANDERSON,                    NO. CIV. 2:09-2519 WBS JFM
14                                (Court of Appeals No. 08-73946)
             Petitioner,
15
                                  MEMORANDUM OF DECISION
16       v.

17
ERIC H. HOLDER JR., Attorney
18 General,

19           Respondent.
   _____/
20

21
                          ----oo0oo----
22

23           Pursuant to 8 U.S.C. § 1252(b)(5)(B), the Ninth Circuit

24 Court of Appeals transferred this matter to this court for a

25 determination of petitioner Gary Anderson's claim that he is a

26 United States citizen.  Petitioner asks for a declaratory

27 judgment that he obtained United States citizenship at birth.

28 After considering the arguments of counsel, the parties' Joint

                              1

Statement of Facts, and the depositions submitted to the court, the court finds that petitioner has not met his burden of establishing that he is a United States citizen and will therefore deny his request for declaratory relief.

This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  Fed. R. Civ. P. 52(a); see 8 U.S.C. § 1252(b)(5)(B).

I.   Procedural History

On January 3, 1996, petitioner was convicted for conspiring to distribute and possess with the intent to distribute methamphetamine.  The then-existing Immigration and Naturalization Service initiated removal proceedings against petitioner on September 7, 2000.  On January 11, 2001, an immigration judge found that petitioner was a United States citizen and terminated removal proceedings.  The Board of Immigration Appeals reversed this decision and ordered petitioner removed to England on June 22, 2001.  Petitioner filed a petition for review with the Ninth Circuit on October 16, 2007, which remains pending.  See Anderson v. Holder, No. 07-74042.

On June 26, 2008, petitioner filed a motion to reopen the removal proceedings with the Board of Immigration Appeals. On August 14, 2008, petitioner filed a second petition with the Ninth Circuit, which is also pending, challenging the Board of Immigration Appeals' decision to deny his motion to reopen.  See Anderson v. Holder, No. 08-73946.  The two petitions were consolidated on September 16, 2008.  See Anderson, No. 07-74042 at Docket No. 15.  On August 17, 2009, the Ninth Circuit severed

2

the two petitions, held them in abeyance, and transferred
petitioner's second petition to this court for a determination of
citizenship pursuant to 8 U.S.C. § 1252(b)(5).  (Docket No. 1.)

At the scheduled Pretrial Conference on February 8,
2010, the parties indicated that they were in agreement on many,
if not all, of the facts in this matter.  The court accordingly
afforded the parties an opportunity submit a joint statement of
undisputed facts, which the parties filed on March 1, 2010.
(Docket No. 19.)  The court held another Pretrial Conference on
March 1, 2010, where petitioner identified one potential disputed
issue of fact in regard to witness Henry Gitelman's testimony and
asked the court for additional time to take another deposition of
Gitelman so that he could avoid the inconvenience of coming to
Sacramento to testify.  The United States did not oppose this
request.  The court accordingly allowed petitioner to take
another deposition of Henry Gitelman and submit it as part of the
record.  (Docket No. 20.)

The court held a hearing on April 26, 2010, to afford
the parties an opportunity to call witnesses and submit evidence
not already on the record for any disputed issue of material
fact.  Neither party elected to call any witnesses or submit any
additional evidence at the hearing.

II.  Findings of Fact

Petitioner was born on October 1, 1954 in Swindon,
England.  (Joint Statement of Undisputed Material Facts (Docket
No. 19) ¶ 1.)  Petitioner's mother, Mavis Sinclair, also known by
her married name as Mavis Anderson, was born in England on
November 30, 1936.  (Id. ¶¶ 2-3.)  Sinclair became a naturalized

1  United States citizen on February 20, 1974.  (Id. ¶ 4.)
2  Petitioner's biological father, Henry Gitelman, is a United
3  States citizen born in Malden, Massachusetts on February 28,
4  1932.  (Id. ¶¶ 5-6.)  Gitelman lived and intended to permanently
5  remain in Malden, Massachusetts.  (Id. ¶ 7.)  At nineteen,
6  Gitelman joined the United States Air Force and was stationed in
7  England.  (Id. ¶ 8.)  Gitelman lived in England as a member of
8  the Air Force from 1952 until 1955, when he was honorably
9  discharged.  (Id. ¶¶ 9-10).

10      Gitelman and Sinclair had a sexual relationship in
11 England that resulted in the conception of petitioner.  (Id. ¶¶
12 11-12.)  Gitelman learned that Sinclair was pregnant through her
13 parents, who did not approve of Gitelman's relationship with
14 their daughter.  (Id. ¶ 17.)  Sinclair's parents would not give
15 Gitelman permission to marry Sinclair and their romantic
16 relationship ended after Sinclair became pregnant.  (Id. ¶ 26.)
17 Gitelman was not present at the hospital when Sinclair was in
18 labor or during petitioner's birth.  (Id. ¶ 15.)  Gitelman
19 visited petitioner shortly after his birth, paid for Sinclair's
20 hospital expenses, and purchased a baby stroller, which he gave
21 to Sinclair.  (Id. ¶ 16.)  Gitelman's name is not listed on
22 petitioner's birth certificate in part because Sinclair's parents
23 would not give the permission required for Gitelman to put his
24 name on the certificate.  (Id. ¶¶ 23-24.)  Neither Gitelman nor
25 Sinclair attempted to amend the birth certificate to add Gitelman
26 as petitioner's biological father.  (Id. ¶ 23.)

27      Gitelman left England and returned to the United States
28 in 1955.  (Id. ¶ 27.)  Gitelman landed in New York on a troop

4

ship and went to New Jersey for a few days to be discharged. (<u>Id.</u>; Resp't Brief Ex. F. (Jan. 6, 2010 Gitelman Depo.) at 35:23-36:10.)   After his discharge from the Air Force, Gitelman returned to Massachusetts where he lived until at least 1975. (Joint Statement of Undisputed Facts ¶ 27.)   Gitelman never claimed petitioner on his tax returns, took a blood test to establish that he is petitioner's biological father, or lived with petitioner.  (<u>Id.</u> ¶¶ 18-21.)   Gitleman also never provided or agreed in writing to provide financial support for petitioner outside of paying for Sinclair's hospital expenses and purchasing a baby stroller.  (<u>Id.</u> ¶ 22.)

Gitelman had no contact with petitioner from the time he visited petitioner in the hospital shortly after birth until 1999 or 2000, when petitioner was forty-five or forty-six years old.  (<u>Id.</u> ¶ 20.)   In 2000, Gitelman signed an affidavit stating that he is petitioner's biological father.  (<u>Id.</u> ¶ 28.)   In 2001, Gitelman also provided telephonic testimony at petitioner's hearing in immigration court that he is petitioner's biological father.  (<u>Id.</u>)   Gitelman has never denied that he is petitioner's biological father and has told a number of friends over the years that he had a son in England.  (<u>Id.</u> ¶ 14; Resp't Brief Ex. A (Mar. 25, 2010 Gitelman Depo.) at 5-8, 11-14.)

Sinclair married Ted Anderson in Detroit, Michigan on May 23, 1964.  (Joint Statement of Undisputed Facts ¶ 31.)   Ted Anderson is a United States citizen, born in North Carolina on September 4, 1936.  (<u>Id.</u> ¶ 29.)   Ted Anderson lived in North Carolina from his birth until April 6, 1956.  (<u>Id.</u> ¶ 30.)   When petitioner was twelve years old, he moved from England to the

1   United States on January 10, 1966 to live with Ted Anderson and

2   his mother. (Id. ¶¶ 36-37.) Upon arriving in the United States,

3   petitioner began living with Ted Anderson and Sinclair in

4   Pontiac, Michigan. (Id. ¶¶ 38-39.) On March 16, 1967, Ted

5   Anderson adopted petitioner. (Id. ¶ 31.) Gitelman was not

6   notified that petitioner was living in the United States or that

7   Ted Anderson adopted him until Gitelman spoke with Sinclair in

8   2000. (Id. ¶¶ 32-34.)

9        Petitioner lived continuously, and intended to

10   permanently remain in, Michigan from January 1966 until 1971 or

11   1972, when he moved to Minnesota with Ted Anderson and Sinclair.

12   (Id. ¶¶ 39, 41.) Petitioner continuously lived in Minnesota,

13   where he intended to permanently remain, until July 1975. (Id. ¶

14   41.) He lived with Sinclair and Ted Anderson in Minnesota until

15   they moved to Arizona. (Id.) Six to nine months later,

16   petitioner also moved to Arizona in July 1975. (Id. ¶¶ 41-2.)

17   Petitioner lived with Sinclair and Ted Anderson in Arizona for a

18   year, until Sinclair and Anderson moved into their own home while

19   petitioner stayed in an apartment on his own. (Id. ¶ 42.)

20   Petitioner became a Lawful Permanent Resident of the United

21   States on July 1, 1976, when he was twenty-one years old. (Id. ¶

22   40.) Petitioner lived in Arizona until 1995, except for the time

23   when he was incarcerated for various criminal sentences in

24   Arizona and Florida. (Id. ¶ 43.)

25   III. Analysis and Conclusions of Law

26        In a proceeding under 8 U.S.C. § 1252(b)(5), the

27   petitioner bears the burden of proving citizenship by a

28   preponderance of the evidence. See Sanchez-Martinez v. I.N.S.,

714 F.2d 72, 74 (9th Cir. 1983).  "There are 'two sources of
citizenship, and two only: birth and naturalization.'"  Miller v.
Albright, 523 U.S. 420, 423 (1998) (quoting United States v. Wong
Kim Ark, 169 U.S. 649, 702 (1898)).  Citizenship at birth can be
acquired by being born in the United States.  If a person is not
born in the United States, he or she can acquire citizenship at
birth only as provided by Congress.  See id. at 423-24.  "'The
applicable law for transmitting citizenship to a child born
abroad when one parent is a U.S. citizen is the statute that was
in effect at the time of the child's birth.'"  Id. at 1162
(citing United States v. Viramontes-Alvarado, 149 F.3d 912, 915
(9th Cir. 1998)) (quoting Ablang v. Reno, 52 F.3d 801, 803 (9th
Cir. 1995)) (quoting Runnett v. Shultz, 901 F.2d 782, 783 (9th
Cir. 1990)).

        At the time of petitioner's birth in 1954, former 8
U.S.C. § 1401(a)(7) of the Immigration and Nationality Act of
1952 ("INA") conferred United States citizenship at birth to:

> a person born outside of the geographical limits of the
> United States and its outlying possessions of parents one
> of whom is an alien, and the other a citizen of the
> United States who, prior to the birth of such person, was
> physically present in the United States or its outlying
> possessions for a period or periods totaling not less
> than ten years, at least five of which were after
> attaining the age of fourteen years: *Provided*, That any
> periods of honorable service in the Armed Forces of the
> United States by such citizen parent may be included in
> computing the physical presence requirements of this
> paragraph.

8 U.S.C. § 1401(a)(7) (June 27, 1952).  Section 1409(a) of the
INA provided that § 1401(a)(7) could provide citizenship to
children born out-of-wedlock only "if the paternity of such child
is established while such child is under the age of twenty-one

7

years by legitimation." Id. § 1409(a).  Accordingly, under the
statute, the method by which an out-of-wedlock child can
establish his paternity is through being legitimated.

In addition, § 1101(c)(1) provided that the term
"child" meant:

> an unmarried person under twenty-one years of age and
> includes a child legitimated under the law of the child's
> residence or domicile, or under the law of the father's
> residence or domicile, whether in the United States or
> elsewhere, and, except as otherwise provided in sections
> 1431-1434 of this title, a child adopted in the United
> States, if such legitimation or adoption takes-place
> before the child reaches the age of sixteen years, and
> the child is in the legal custody of the legitimating or
> adopting parent or parents at the time of such
> legitimation or adoption.

Id. § 1101(c)(1).  Former § 1101(c)(1) therefore established that
a court must look to the law of the U.S. state or country of the
child and father's residence to determine if a child was
legitimated.  See Solis-Espinoza v. Gonzales, 402 F.3d 1090,
1093-94 (9th Cir. 2005); Scales v. I.N.S., 232 F.3d 1159, 1163
(9th Cir. 2000).  Thus, for an out-of-wedlock child to obtain
citizenship, he or she must prove that he or she was legitimated
under the law of a U.S. state or country of his or her father's
residence before the age of twenty-one.  See Burgess v. Meese,
802 F.2d 338, 340 (9th Cir. 1986).

A.  "Born Out-of-Wedlock"

Petitioner claims that he can establish citizenship at
birth through both his biological father, Gitelman, and his
adoptive father, Ted Anderson.  Before addressing these specific
contentions, the court must first determine whether petitioner
should be considered "born out-of-wedlock" for purposes of the

8

statute.  Petitioner's biological parents never married.
Petitioner argues, however, that his adoption by Ted Anderson at
age twelve legitimated him and entitles him to all the rights and
privileges of being born in wedlock and that accordingly he
should be treated as having been born in wedlock from birth under
§ 1407(a)(7).

In Martinez-Madera v. Holder, 559 F.3d 937 (9th Cir.
2009), the Ninth Circuit addressed a theory very similar to that
advanced by petitioner.  The Martinez-Madera court specifically
rejected the argument that "an alien parent who is unmarried at
the time of the birth of a person who later claims citizenship
may be deemed to have been married to a citizen at the time of
birth."  Martinez-Madera, 559 F.3d at 942.  Instead, the Ninth
Circuit followed the Fifth Circuit's ruling in Marquez-Marquez v.
Gonzalez, 455 F.3d 548 (5th Cir. 2006), finding the theory that a
child "can derive citizenship 'by birth' from a subsequent U.S.
citizen stepfather . . . [is] an untenable and paradoxical
reading of § 1401's requirement that one be born in wedlock to a
U.S. citizen to derive citizenship from that parent."  Martinez-
Madera, 559 F.3d at 942 (emphasis added).  As explained by the
court in Marquez-Marquez:

> [Section 1401] does not address citizenship through
> adoption, and its text explicitly addresses only
> citizenship "at birth" ("[t]he following shall be
> nationals and citizens of the United States at birth").
> Moreover, [§ 1401(g)][1] requires that the "person" be

---

[1]   Under the 1986 amendments to the INA, § 1401(a)(7)
became § 1401(g).  See 8 U.S.C. § 1401(g)(1986).  Although
Marquez-Marquez and Martinez-Madera were both interpreting the
1986 version of § 1401, "[t]he text of 8 U.S.C. §§ 1401 and 1409
was not amended in any relevant way between 1952 and 1986" that

9

"born . . . of" a citizen parent, obviously reflecting a relationship when "born." That reading is likewise enhanced by [§ 1401(g)'s] express requirement that the citizen parent's United States residency prerequisites be all fulfilled "prior to the birth of such person," a requirement that would be pointless if the citizen parent could first become the parent of such person more than a decade after the person's birth.

Marquez-Marquez, 455 F.3d at 556-57.

Petitioner argues that the Ninth Circuit's decision in Solis-Espionza supports his contention that petitioner can be considered born in wedlock due to his subsequent adoption. Solis-Espionza is easily distinguishable. In Solis-Espinoza, the petitioner's biological father was married to a citizen stepmother at the time of the child's birth. Solis-Espinoza, 401 F.3d at 1091-92. The Ninth Circuit found that the person claiming citizenship was a legitimate child born "in wedlock" because his parents were married at the time of her birth, even though his father's wife was not his biological mother. See id. at 1093-94. Here, like the petitioners in Martinez-Madera and Marquez-Marquez, petitioner was not born into any marital relationship. See Martinez-Madera, 559 F.3d at 941 (distinguishing Solis-Espinoza and Scales because both involved children born into a marriage). Accordingly, Solis-Espinoza is not controlling.

Petitioner's position conflates legitimacy with the state of being born in wedlock. None of the authority under English or Massachusetts law cited by petitioner stands for the proposition that an adopted child is considered born in wedlock

would change the outcome in this case. Martinez-Madera, 559 F.3d at 941 n.1.

for immigration purposes.  Rather, the authority simply indicates that under English and Massachusetts law, an adopted child is treated as though he or she was legitimate at birth.  <u>See, e.g.</u>, <u>Minor Child v. Mich. State Health Comm'r</u>, 16 Mich. App. 128 (1969); Adoption Act, 1926, 16 & 17 Geo. 5, c. 20, § 5 (Eng.). Being born "out-of-wedlock" is a factual condition distinct from the legal state of being considered "illegitimate."  <u>See</u> <u>Lau v. Kiley</u>, 562 F.2d 543, 548 (2d Cir. 1977) ("Legitimacy is a legal concept.  The law makes a child legitimate or illegitimate . . . Indeed the term 'illegitimate' means '(t)hat which is contrary to law(.)'" (internal citation omitted)).  While legitimacy may be retroactive to a child's birth, it is clear the Ninth Circuit has held that a child cannot be considered retroactively "born in wedlock" because of a subsequent adoption and marriage by one of the child's parents.  <u>See</u> <u>id.</u> at 941-42.

Under this interpretation of § 1409 it would not be impossible for a child born out-of-wedlock to gain citizenship unless his parents subsequently married under the statute.  A child born out-of-wedlock initially could be subsequently legitimated before his or her twenty-first birthday and obtain all the rights of citizenship.  <u>See</u> 8 U.S.C. § 1409(a).  As previously explained, § 1101(c)(1) of the INA mandates that a court must look to the law of the residence of the child or father to determine if a child was legitimated.  <u>See</u> <u>Solis-Espinoza</u>, 402 F.3d at 1093-94; <u>Scales</u>, 232 F.3d at 1163.  The variety of legitimation requirements across domiciles ensures that it will not always be necessary for a child's biological parents to marry to confer citizenship on an out-of-wedlock

1  child.  Petitioner's argument that the statute excludes

2  illegitimate children entirely from citizenship is therefore

3  clearly false.

4         The Supreme Court has held that "§ 1409(a) is

5  consistent with the constitutional guarantee of equal

6  protection." <u>Nquyen v. I.N.S.</u>, 533 U.S. 53, 58-59 (2001).

7  Although the Supreme Court was ruling on the contemporary version

8  of § 1409(a), the current version of the statute arguably creates

9  a higher hurdle for illegitimate children to obtain citizenship

10  because in addition to establishing legitimacy, paternity in a

11  competent court, or an acknowledgment of paternity in writing,

12  the child must establish that a (1) blood relationship exists

13  with the father, (2) the father was a national at the child's

14  birth and (3) the father agreed to provide financial support in

15  writing.  8 U.S.C. § 1409(a) (1986).  It is not the place of this

16  court to disturb the rulings of the Ninth Circuit and the Supreme

17  Court on a limited hearing to determine whether petitioner is a

18  United States citizen.  Accordingly, since petitioner was born

19  out-of-wedlock, he must meet the requirements of § 1409(a) to be

20  a United States citizen.

21         B.    <u>Citizenship Through Gitelman</u>

22         Petitioner argues that he acquired citizenship at birth

23  through Gitelman.  It is undisputed that petitioner has fulfilled

24  the requirements of § 1401(a)(7), since Gitelman was born a

25  United States citizen and fulfilled the physical presence

26  requirements by living in Massachusetts from his birth until he

27  left to serve in the Air Force and then returning to live in

28  Massachusetts after his service.  <u>See</u> 8 U.S.C. § 1401(a)(7)

1   (1952).  The remaining question is whether the paternity of

2   petitioner was established by legitimation before petitioner

3   turned twenty-one years old.  See id. § 1409.

4            Legitimacy is a legal concept, and a state has the

5   power to define what constitutes it, how to regulate it, or even

6   to abolish it altogether.  Lau, 563 F.2d at 549.  Because states

7   have the power to determine what constitutes legitimacy under

8   former § 1101(c)(1), a person who is legitimated under the law of

9   one state does not become illegitimate under § 1409 if the child

10  moves to another state with a different definition of legitimacy.

11  See Lau, 563 F.2d at 551; see also Solis-Espinoza, 402 F.3d at

12  1093-94; Scales, 232 F.3d at 1163; O'Donovan-Conlin v. U.S.

13  Dep't. of State, 255 F. Supp. 2d 1075, 1082 (N.D. Cal. 2003).  It

14  is undisputed that petitioner was a resident of England and the

15  states of Michigan, Minnesota, and Arizona before the age of

16  twenty-one.  Gitelman was a resident of Massachusetts before

17  petitioner turned twenty-one.[2]  Accordingly, petitioner is a

18  United States citizen if he established his paternity by

19  legitimation under the laws of either Arizona, Michigan,

20  Minnesota, England, or Massachusetts before his twenty-first

21

22          [2]   While petitioner claims that Gitelman was also a
    resident of New Jersey, Gitelman only briefly stopped in New
23  Jersey for "a few days" at Camp Kilmer waiting to be discharged
    from the Air Force.  (See Jan. 6, 2010 Gitelman Depo. at 35:23-
24  36:10.)  Such a brief, temporary stay in New Jersey at a military
    base is insufficient to establish New Jersey as Gitelman's
25  domicile or residence.  See 8 U.S.C. § 1101(a)(33) (defining
    "residence" as "principal actual dwelling place"); Charles Alan
26  Wright, Arthur R. Miller. & Edward H. Cooper, 13 E Federal
    Practice and Procedure § 3617 at 567 (3d ed.) ("Service personnel
27  are presumed not to acquire a new domicile when they are
    stationed in a place pursuant to orders; they retain the domicile
28  they had at the time of entry into the service.").

1  birthday.   See 8 U.S.C. § 1101(c)(1) (1952).

2       1.  Arizona

3       Petitioner primarily stresses that he has established

4  paternity by legitimation under the laws of Arizona.  (See

5  Pet'r's Reply at 5-14.)  Petitioner moved to Arizona in July

6  1975, three months before his twenty-first birthday, and remained

7  a there until 1995.  The United States does not dispute that

8  petitioner was a resident of Arizona before his twenty-first

9  birthday.  Beginning in 1921, Arizona state law has provided

10 that, "[e]very child is . . . the legitimate child of its natural

11 parents and as such is entitled to support and education to the

12 same extent as if it had been born in lawful wedlock."  1921

13 Ariz. Sess. Laws Ch. 114; see In re Silva's Estate, 32 Ariz. 573,

14 575-76 (1927); Moreno v. Sup. Court of Pima County, 3 Ariz. App.

15 361, 363 (1966).  In 1975, Arizona law specifically stated that

16 every child is the legitimate child of its natural parents.  See

17 Ariz. Rev. Stat. § 8-601, amended by Laws 1975, Ch. 117 § 2.

18 Petitioner claims that because Gitelman has admitted that he is

19 petitioner's biological father he is legitimate under the law of

20 Arizona and therefore Gitelman established his paternity by

21 legitimation.

22       In Flores-Torres v. Holder, Nos. C 08-01037 WHA, C

23 09-03569 WHA, --- F. Supp. 2d ----, 2009 WL 5511156 (N.D. Cal.

24 Dec. 23, 2009), the District Court for the Northern District of

25 California addressed the meaning of the term "paternity by

26 legitimation" under former § 1432(a), a statute dealing with

27 naturalization of a child born outside the United States.   The

28 facts are almost identical to those in this case.   The petitioner

14

1  in Flores-Torres was born in El Salvador, which, like Arizona,
2  abolished the concept of illegitimacy.  Flores-Torres, 2009 WL
3  5511156, at *6.  The Flores-Torres court concluded that the
4  phrase "paternity . . . by legitimation" in § 1432(a) meant that
5  the only means by which paternity could be established was
6  through the act of legitimation.  Id.  The court emphasized the
7  word "by" in the phrase and concluded that the petitioner could
8  not show that his paternity was established by legitimation
9  because even though his parents demonstrated paternity by other
10 means, they did not engage in an affirmative act of legitimation
11 since El Salvador lacked such a procedure all together.  See id.
12 at *5-6.

13         Petitioner's argument, like the petitioner's claim in
14 Flores-Torres, ignores the distinction between "legitimation" and
15 "legitimacy" in general.  "Legitimation" denotes a procedure--an
16 act or occurrence that makes a child born out-of-wedlock
17 legitimate under the law.  A "legitimate" child, on the other
18 hand, could be either a child born into wedlock or a child born
19 out-of-wedlock who has been legitimated or whom the law deems to
20 be legitamate.  See id. at *6 (noting "the distinction between
21 whether a child was legitimated in general and whether a child's
22 paternity was established by legitimation" (emphasis in
23 original)).  In fact, a Senate report from 1950 discussing the
24 phrase "paternity by legitimation" stated that "establishment of
25 legitimation is a matter of complying with the laws of the place
26 of legitimation . . . [a]s a general proposition, legitimation is
27 accomplished by the marriage of the parents with acknowledgment
28 of paternity by the putative father."  Sen. Rep. No. 1515, at

692-93 (1950).  Congress recognized that legitimation involved
compliance with a legal process and believed that a step as
strong as marriage of a child's biological parents would be
necessary to accomplish it.  It is therefore clear that
Congress's intent was to require the child's parents to go
through some process to acknowledge paternity in order to
transfer citizenship to their child.

        This distinction is important because it goes directly
to one of the purposes of § 1409--to deter fraud.  In requiring
that a petitioner's father establish paternity by legitimation,
Congress was expressing the belief that it was "preferable to
require some formal legal act to establish paternity . . . to
deter fraud."  Miller, 523 U.S. at 437 (emphasis added).  The
statute requires the additional affirmative step of legitimation
to ensure that the state establishes a real, lasting, and legal
link between parent and child before granting citizenship on the
basis of that biological relationship.  If something at least
akin to a formal legal act of legitimation is not required, the
government can not ensure that a true connection exists between a
putative parent and child born out-of-wedlock that entitles that
child to citizenship.  Otherwise, a person could simply provide
an affidavit, written decades after his or her birth, stating
that he or she is the biological child of a United States citizen
and demand citizenship.  Such a system would be rife with
opportunities for fraud.

        It would be a strange result contrary to the intent of
Congress for petitioner to obtain United States citizenship by
birth simply because he was fortunate enough to move to Arizona

16

before the age of twenty-one without his father taking any affirmative steps to acknowledge a paternal relationship with him.  Arizona's legitimacy statute appears to have been meant to establish "the duty of natural parents to support their children."  See In re Silva's Estate, 32 Ariz. at 577-78 ("[T]he legislative intent was to . . . require the father to support and educate and give a home to, or otherwise provide for, his children born out of wedlock, who, by reason of their tender years, need such care . . . ."); Moreno, 3 Ariz. App. At 363. The statute affords all children rights, but does not create a procedure for establishing paternity by legitimation.  Under Arizona law, being legitimate does not establish a paternal link between a child and a particular parent.  Instead of linking legitimation to a legal establishment of paternity, as envisioned by Congress, Arizona law declares all children legitimate and makes a determination of paternity of a child a separate inquiry.

Even though petitioner was legitimate under Arizona law, Gitelman took no steps to establish his paternity, by legitimation or otherwise, before petitioner's twenty-first birthday.  Petitioner argues that Gitelman established his paternity because he did not deny that he was petitioner's father before petitioner was twenty-one years old.  Gitelman did not attempt to establish his paternity or formally acknowledge it in any fashion until petitioner was at risk of deportation in 2000 and Sinclair asked for his help in petitioner's deportation proceedings.  Gitelman's failure to deny paternity and occasional references to friends that he had a son in England are not the same as legally establishing his paternity of petitioner.  It is

17

highly doubtful that Congress envisioned that a child could receive citizenship by virtue of a blood relationship with a father that had no contact with his child and who was not even aware that his child was in the United States.  Petitioner is not a citizen by virtue of his Arizona residency because his paternity was not established by legitimation.  Gitelman did not go through any procedure, let alone legitimation as required by § 1409(a), to establish his paternity before petitioner's twenty-first birthday.

In support of his position, petitioner urges the court to follow two cases, O'Donovan-Conlin and Lau.  However, these cases are distinguishable, because neither interpreted the phrase "paternity by legitimation" and instead found that a child was "legitimate" for immigration purposes under the law of a state that had abolished legitimacy.  See O'Donovan-Conlin, 255 F. Supp. 2d at 1082 (finding that the child was legitimate under the law of Arizona for immigration purposes by virtue of his biological tie); Lau, 563 F.3d at 551 (holding that because Chinese law makes all children legitimate the petitioner was a "legitimate child" for purposes of 8 U.S.C. § 1101(b)(1)[3]).  The

---

[3]      8 U.S.C. § 1101(b)(1) defines a child for the purposes of Chapters I and II of the INA as:

an unmarried person under twenty-one years of age who is—

(A) a legitimate child; or . . .

(C) a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at

1  court agrees with the reasoning of <u>Flores-Torres</u>, that to hold
2  that petitioner had his father's paternity established by
3  legitimation when he took no affirmative legal steps to connect
4  himself to his child in any manner would read the words "by
5  legitimation" out of the statute.  This is contrary to the plain
6  language of the statute and Congress's intent to avoid fraud.
7  Accordingly, petitioner does not meet the requirements of §
8  1409(a) under Arizona law.

9            2.  <u>Michigan</u>

10           Petitioner was at one time a resident of Michigan.
11  Petitioner argues that Gitelman's paternity was established by
12  legitimation because under Michigan law (1) a presumption of
13  paternity exists until rebutted by the father; (2) a father can
14  legitimate a child by acknowledging paternity in writing; and (3)
15  discrimination against illegitimate children is prohibited.  The
16  presumption of paternity petitioner identifies appears in section
17  29 of Michigan's Divorce Act, Mich. Comp. Laws § 552.29.  Section
18  29 states that "[t]he legitimacy of all children begotten before
19  the commencement of any action under this act shall be presumed
20  until the contrary be shown."  Mich. Comp. Laws § 552.29.  The
21  Divorce Act therefore provides for a presumption of legitimacy
22  for children born into a marriage in a divorce action.  <u>See</u>
23  <u>Shepherd v. Shepherd</u>, 81 Mich. App. 465, 469 (1978) ("By statute
24  and case law, it is presumed that any child conceived or born to

25  ────────────────────

26      the time of such legitimation[.]

27  The difference in the statue between a "legitimate child" under
   subsection (A) and a "child legitimated" through legitimation in
28  subsection (B) further reinforces the notion that there is a
   distinction between "legitimacy" and "legitimation."

1    a married couple prior to the commencement of a suit for divorce

2    is legitimate.")   This presumption is inapplicable to petitioner

3    because his parents never married.

4          Petitioner next argues that he was legitimated under

5    former Michigan Compiled Laws section 702.83 when Gitelman signed

6    an affidavit in 2000 stating that he is petitioner's biological

7    father.  Section 702.83, which was repealed in 1979, provided

8    that a child born out-of-wedlock could be legitimated "with the

9    identical status, rights and duties of a child born in lawful

10   wedlock, effective from its birth" upon either the marriage of

11   its parents or if the father and mother filed a written

12   acknowledgment of paternity with the probate court.  Mich. Comp.

13   Laws § 702.83 (1965); see In re Estate of Jones, 207 Mich. App.

14   544, 550 (1994).

15         Gitelman did not fulfill the requirements of section

16   702.83 for two reasons.  First, the Gitelman's affidavit was

17   written in 2000, twenty-five years after petitioner's twenty-

18   first birthday.  While section 702.83 legitimates a child

19   retroactively from birth, the plain language of § 1409(a) clearly

20   states that the establishment of paternity by legitimation must

21   occur before the child reaches the age of twenty-one.  This

22   means that the act of legitimation must occur before the

23   petitioner reaches twenty-one years of age.  See Matter of

24   Cortez, 16 I. & N. Dec. 289, 289 (1977).  To hold otherwise would

25   effectively nullify the twenty-one year period for legitimation

26   in § 1409(a).  Therefore, under the terms of § 1409(a), Gitelman

27   failed to establish petitioner's legitimation because his

28   affidavit of paternity was not signed before petitioner became

                                    20

twenty-one years old.   Second, even assuming Gitelman's affidavit was timely, petitioner was not legitimated under section 702.83 because Gitelman did not file his written acknowledgment of paternity with the Michigan probate court in contravention of the statute.

Petitioner's final argument is that Michigan has found arbitrary classifications of illegitimate children to be unconstitutional.   See Smith v. Robbins, 91 Mich. App. 284 (1979).   However, petitioner has no authority that indicates that Michigan abolished the concept of legitimacy and has not explained why Michigan's legitimation procedure is an arbitrary classification.   The only case petitioner cites merely holds that the Michigan Paternity Act must be interpreted so as not to create a distinction between illegitimate children of unwed mothers and illegitimate children of wed mothers.   See Smith, 91 Mich. App. at 291.   Without any explanation as to why Michigan legitimation law as applied to petitioner at the time was unconstitutional, petitioner cannot succeed in claiming that Gitelman could have established paternity by legitimation.   Even if petitioner is correct and Michigan has abolished the concept of legitimacy, he cannot identify a statue that legitimated him. If there is no possible mechanism for Gitelman's paternity to be established by legitimation, then petitioner cannot acquire citizenship under the clear language of § 1409(a).   See Flores-Torres, 2009 WL 5511156, at *6.

3.   Minnesota

Petitioner was also a resident of Minnesota from 1971 or 1972 until July 1975.   Petitioner argues that he was

21

legitimated under Minnesota law in accordance with former
Minnesota Statutes section 517.19 (1976), which provided that
children of prohibited marriages were legitimate.  In 1954,
English law permitted marriage between persons who were not
widows or widowers and were between the ages of sixteen and
twenty-one only with the consent of the parties' parents or
guardians.  Marriage Act, 1949, 12, 13, & 14 Geo. 6, c. 76 §§ 2-
3, 78 (Eng.).  If consent was not given, the parties could then
apply to a court to grant consent for the marriage.  Id. § 3.  At
the time of petitioner's residency in Minnesota, section 517.19
provided that "[i]llegitmate children shall become legitimated by
the subsequent marriage of their parents to each other, and the
issue of marriages declared null in law shall nevertheless be
legitimate."  Minn. Stat. § 517.19 (1976).  The Minnesota
legislature then amended section 517.19 in 1978, after
petitioner's twenty-first birthday, to add that "[c]hildren born
of a prohibited marriage are legitimate."  Minn. Stat. § 517.19
(1978).  Petitioner argues that he was born of a prohibited
marriage because Sinclair was seventeen at the time of his birth,
and thus unable to marry twenty-one year old Gitelman without the
permission of Sinclair's parents.

        Under either version of the statute, petitioner has not
been legitimated under Minnesota law.  If the pre-1978 statute
applies, section 517.19 did not allow for children of prohibited
marriages to become legitimated.  Instead, the statute provided
that a child could be legitimated only when his or her parents
married each other or were in a marriage that was nullified.
Since petitioner's parents were never married, he was not

22

1  legitimated under the pre-1978 version of section 517.19.

2       If the post-1978 version of the statute applies,
3  petitioner has not established that he was born of a prohibited
4  marriage.  Section 517.03 defines "prohibited marriages" as "a
5  marriage entered into prior to the dissolution of an earlier
6  marriage of one of the parties" and various incestuous marriages.
7  See Minn. Stat. § 517.03 (1978).  The section implies that
8  children born into marriages which Minnesota refuses to recognize
9  at law will nonetheless be considered legitimate.  Petitioner's
10 parents never entered into a marriage at all, let alone one of
11 the types of prohibited marriages prescribed by Minnesota law.
12 Sinclair and Gitelman were not completely prohibited from
13 marrying.  They could have either obtained court consent to
14 marry, which neither attempted to do, or married after Sinclair's
15 twenty-first birthday under English law.  See Marriage Act, 1949,
16 12, 13, & 14 Geo. 6, c. 76 §§ 2-3, 78 (Eng.).  Accordingly,
17 petitioner has not established that he is a child of a prohibited
18 marriage and was not legitimated under Minnesota law.

19       4.  Massachusetts

20       Petitioner could also be legitimated under the law of
21 Massachusetts, since it was his father's domicile.  Despite
22 Gitelman's presence in England for military service,
23 Massachusetts remained his domicile because "[s]ervice personnel
24 are presumed not to acquire a new domicile when they are
25 stationed in a place pursuant to orders; they retain the domicile
26 they had at the time of entry into the service."  Charles Alan
27 Wright, Arthur R. Miller. & Edward H. Cooper, 13 E Federal
28 Practice and Procedure § 3617 at 567 (3d ed.).  Petitioner argues

23

1    that he was legitimated under Massachusetts law because the

2    Massachusetts Supreme Court's holding in Lowell v. Kowlaski, 380

3    Mass. 663 (1980), which held that an acknowledged illegitimate

4    child has the same legal rights of inheritance as a legitimate

5    child, proves that he was legitimated.

6            The scope of the Lowell decision, however, is not as

7    expansive as petitioner argues.  Prior to Lowell, a child born

8    out-of-wedlock could only be legitimated by marriage of his or

9    her natural parents together with an acknowledgment of paternity

10   by his or her father.  Mass. Gen. Laws ch. 190 § 7 (1943).  The

11   Lowell court determined that an illegitimate child is permitted

12   to inherit his or her biological father's estate if the father

13   has acknowledged his paternity to the same extent as he has to

14   any of his other children and struck down the previous version of

15   Massachusetts General Laws chapter 190 section 7.  See Lowell,

16   380 Mass. at 670-71.  This exception to the general legitimacy

17   rule was limited only for the purposes of inheritance.  See

18   Matter of Oduro, 18 I. & N. Dec. 421, 424 (1983).  The amended

19   version of chapter 190 section 7 still maintained the previous

20   legitimation standard that existed before Lowell, stating: "An

21   illegitimate person whose parents have intermarried and whose

22   father has acknowledged him as his child or has been adjudged his

23   father . . . shall be deemed legitimate and shall be entitled to

24   take the name of his parents to the same extent as if born in

25   lawful wedlock."  Mass. Gen. Laws ch. 190 § 7 (1980).  The

26   statute then went on to state that "[i]f a decedent has

27   acknowledged paternity of an illegitimate person or if during his

28   lifetime or after his death a decedent has been adjudged to be

                                  24

1    the father of an illegitimate person, that person is heir of his

2    father . . . ."  <u>Id.</u>

3          It is therefore clear that Massachusetts carved out an

4    exception that permitted a simple acknowledgment of paternity to

5    be sufficient for inheritance purposes, but not to legitimate a

6    child for all other purposes under Massachusetts law.

7    Accordingly, <u>Lowell</u> does not apply to petitioner's case, since he

8    is attempting to show legitimation for a purpose other than

9    inheritance.  Gitelman did not marry petitioner's biological

10   mother and acknowledge his paternity.  Petitioner thus was not

11   legitimated under Massachusetts law.

12          5.   <u>England</u>

13          English law is also relevant to petitioner's

14   citizenship claim, since he resided in England from 1954 until

15   moving to the United States in 1965.  Under English law at the

16   time of petitioner's birth, a child born out-of-wedlock could be

17   legitimated through the subsequent marriage of the child's

18   parents, adoption, a special act of Parliament, and in certain

19   instances, if the child's parents were in a voidable marriage.

20   <u>See</u> Legitimacy Act, 1926, 16 & 17 Geo. 5, ch. 60 (Eng.);

21   Legitimacy Act, 1959, 7 & 8 Eliz. 2, ch. 73 (Eng.).  Gitelman

22   clearly did not adopt petitioner or marry Sinclair, and

23   accordingly he was not legitimated under the English legitimacy

24   laws in existence before petitioner was twenty-one years old.

25          However, petitioner contends that he was legitimated

26   under the English law because the concept of illegitimacy no

27   longer exists in England due to the enactment of the Human Rights

28   Act, 1998, ch. 42 (Eng.).  The Human Rights Act implemented the

                                   25

European Convention on Human Rights ("ECHR") into English law.
Article 14 of the ECHR includes language prohibiting
discrimination based on "birth or other status."  Petitioner
argues that the Human Rights Act was retroactive in effect and
that he was legitimated before the age of twenty-one under
English law because the concept of illegitimacy was retroactively
abolished.  However, "it is now settled, as a general
proposition, that the Human Rights Act is not retrospective" in
English courts.  Re: McKerr, [2004] UKHL 12, 16; see also Wilson
v. Sec'y of State for Trade & Industry, [2003] UKHL 40 ("to apply
[the Human Rights Act] in such cases, and thereby change the
interpretation and effect of existing legislation, might well
produce an unfair result for one party or the other.  The Human
Rights Act was not intended to have this effect."); Reginia v.
Lambert, [2001] UKHL 31.  Petitioner therefore was not
legitimated by Gitelman under English law because the Human
Rights Act's changes to legitimacy law were not retrospective and
enacted well after petitioner's twenty-first birthday.[4]

        C.   Citizenship Through Ted Anderson

        Petitioner also argues that he can obtain citizenship
through Ted Anderson as his adoptive father because Ted should be
treated as petitioner's biological father from the moment of
adoption.  The Supreme Court and Ninth Circuit, however, have
clearly stated that an adoptive father cannot transmit

_____

        [4]   Although petitioner objects to the qualifications of
the United States's expert under Federal Rule of Evidence 702,
the objection is irrelevant, since the court did not rely upon
either expert's opinion in reaching its decision, but rather
independently interpreted the laws of England.

26

citizenship "at birth" to his adoptive child as a biological father can under § 1409(a).  In <u>Miller</u>, 523 U.S. 420 (1998), a majority of the court indicated that the 1952 version of § 1409(a) requires a biological relationship between the out-of-wedlock child and a father to transfer citizenship at birth. Justice Stevens, writing for himself and Chief Justice Rehnquist, noted that, "[a]s originally enacted in 1952, § 1409(a) required simply that 'the paternity of such child [born out-of-wedlock] is established while such child is under the age of twenty-one years by legitimation.' . . . The section offered no other means of proving a biological relationship."  <u>Miller</u>, 523 U.S. at 435 (citation omitted).  Justice Breyer, writing for Justices Ginsburg and Souter, similarly stated that "American statutory law has consistently recognized the rights of American parents to transmit their citizenship to their children."  <u>Id.</u> at 477 (Breyer, J., dissenting) (citations omitted).  Justice Breyer further noted that "ever since the Civil War, the transmission of American citizenship from parent to child, <u>jus sanguinis</u>, has played a role secondary to that of the transmission of a citizenship by birthplace, <u>jus soli</u>."  <u>Id.</u> at 478.  The Justices' understanding of the nature of the transmission of citizenship at birth therefore indicates an understanding of the existence of a biological relationship between parent and child.

     The Ninth Circuit confirmed this interpretation of § 1409(a) in <u>Martinez-Madera</u>, where it held that the theory that a child "can derive citizenship 'by birth' from a subsequent U.S. citizen stepfather . . . [is] an untenable and paradoxical reading of § 1401's requirement that one be born in wedlock to a

U.S. citizen to derive citizenship from that parent." <u>Martinez-</u>
<u>Madera</u>, 559 F.3d at 942 (citation omitted).  The Ninth Circuit
reiterated this interpretation in <u>United States v. Marquet-</u>
<u>Pillado</u>, 560 F.3d 1078 (9th Cir. 2009), finding that § 1409(a)'s
"reference to 'paternity' and to the requirement that a person be
'born . . . of' a United States citizen" along with the
application of the section to children born out-of-wedlock made
it "difficult to see how a man could 'have' a child 'out of
wedlock' if he was not that child's biological father." <u>Marquet-</u>
<u>Pillado</u>, 560 F.3d at 1083.  While the Ninth Circuit has held that
a blood relationship is not required when a child is born during
marriage and at least one parent is a United States citizen, the
law of the circuit is clear that when a child is born out-of-
wedlock a biological relationship must exist between a citizen
parent and the child to transmit citizenship at birth.  <u>Compare</u>
<u>Scales</u>, 232 F.3d at 1166; <u>Solis-Espinoza</u>, 401 F.3d at 1099 <u>with</u>
<u>Marquet-Pillado</u>, 560 F.3d at 1083; <u>Martinez-Madera</u>, 559 F.3d at
942.

        Furthermore, the construction of the 1952 version of
the INA reveals that Congress intended a biological relationship
exist between an out-of-wedlock child and a United States citizen
parent to transmit citizenship at birth.  If petitioner's
interpretation of the statue is correct, there would have been no
need for the naturalization provision of former § 1434, entitled
"Children Adopted by United States Citizens," which allowed a
child adopted by a United States citizen to naturalize before
turning eighteen years-old if the adopting citizen complied with
the section's requirements.  <u>See</u> 8 U.S.C. § 1434 (repealed 1978).

28

1  While "a title alone is not controlling," I.N.S. v. St. Cyr, 533

2  U.S. 289, 308 (2001), the separate naturalization provisions for

3  adopted children along with the language of § 1409(a) indicate

4  that Congress intended that a biological relationship exist

5  between a citizen parent and child for a child to be entitled to

6  birthright citizenship.  See Marquez-Marquez, 455 F.3d at 557.

7       Congress debated amending the "citizenship at birth"

8  provisions in 2000 to allow foreign born children who were

9  adopted by United States citizens to become citizens

10  retroactively at the moment of adoption, as if citizenship was

11  transferred to them at birth.  However, Congress did not amend

12  the provisions because:

13       Both the Departments of Justice and State objected to the
         bill as originally drafted because it confused the
14       fundamental distinction between acquisition of
         citizenship at birth and through naturalization . . . In
15       response to the Administration's concerns, the Committee
         modified the bill to amend the naturalization provisions
16       and grant automatic citizenship, retroactive to the date
         that the statutory requirements are met.
17

18  Matter of Rodriquez-Tejedor, 23 I & N Dec. 153, 161-62 (2001).

19  Congress continues to recognize a distinction between acquisition

20  of citizenship at birth, which requires a biological tie, and

21  naturalization, which serves as a mechanism for adopted children

22  to acquire citizenship.  This serves as a clear signal that

23  Congress did not intend for the citizenship at birth provisions

24  to apply retroactively to adopted children born out-of-wedlock.

25       Under the laws as they existed at the time of

26  petitioner's birth, Ted Anderson could not transmit his

27  citizenship to petitioner at birth as if he was his biological

28  father.  While petitioner could have obtained citizenship through

1  the INA's naturalization provisions, he chose not to do so.

2  Accordingly, petitioner is not a United States citizen by virtue

3  of his adoption by Ted Anderson.

4          IT IS THEREFORE ORDERED that petitioner's request for a

5  declaration that he is a United States citizen be, and the same

6  hereby is, DENIED.

7          The Clerk shall forthwith certify the trial record and

8  this order to the United States Court of Appeals for the Ninth

9  Circuit for further proceedings.

10 DATED:  April 27, 2010

11

12                                          _____
                                            WILLIAM B. SHUBB
13                                          UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                   30